IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

_____

APPEAL NO. 23-10003-GG
_____

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

REGINALD SMITH, JR.

Defendant-Appellant.

_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE MIDDLE DISTRICT OF FLORIDA

_____

INITIAL BRIEF OF APPELLANT

_____


A. FITZGERALD HALL, ESQ.
Federal Defender
Middle District of Florida

KATHERINE HOWARD, ESQ.
Assistant Federal Defender
Appellate Division
NY Atty Reg 5624275
201 S. Orange Avenue, Suite 300
Telephone: 407-648-6338
E-mail: Katherine_Howard@fd.org
Counsel for Appellant

### Appeal No. 23-10003-GG

## *United States of America v. Reginald Smith, Jr.*

### CERTIFICATE OF INTERESTED PERSONS

The persons listed below have an interest in the outcome of this case:

Andrejko, Nicole M.

Antoon II, The Honorable John

Bailey, Lynn Palmer

Bird, Christine Nan

Corrigan, The Honorable Timothy J.

Dalton, The Honorable Roy B.

Gershow, Holly L.

Hall, A. Fitzgerald

Hamilton, William Stephen

Handberg III, Roger B.

Howard, Katherine

Kahn, Conrad Benjamin

Lammens, The Honorable Phillip R.

Lopez, Maria Chapa

**Appeal No. 23-10003-GG**

*United States of America v. Reginald Smith, Jr.*

CERTIFICATE OF INTERESTED PERSONS, CONT.

Rhodes, David P.

Rhodes, Yvette

Skuthan, James T.

Smith Jr., Reginald Herman

No publicly traded company or corporation has an interest in the outcome of this appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Smith requests oral argument. This appeal raises at least two issues that merit oral argument.

First, this appeal presents an opportunity for the Court to clarify the government's burden at sentencing when a defendant objects that his prior convictions do not qualify as predicate offenses for the Armed Career Criminal Act enhancement.

Second, to the extent this Court has questions about how to apply *Erlinger v. United States,* --- S. Ct. ----, 2024 WL 3074427 (June 21, 2024), to defendants on direct appeal who did not raise the constitutional issue below, this appeal presents an excellent vehicle.

Mr. Smith respectfully suggests that argument by counsel familiar with the law and facts will aid the Court in resolution of these important issues.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................. C1

Statement Regarding Oral Argument ....................................................... i

Table of Contents................................................................................. ii

Table of Authorities ............................................................................. v

Statement of Subject-Matter and Appellate Jurisdiction ......................xi

Statement of the Issues........................................................................ 1

Statement of the Case .......................................................................... 2

   I.   Course of Proceedings .................................................................. 2

   II.   Statement of the Facts ................................................................. 3

      A. Mr. Smith is charged for possessing a shotgun and nine pills while hunting. ...................................................................... 3

      B. Mr. Smith objects to the ACCA enhancement. ......................... 4

      C. The district court sentences Mr. Smith to the mandatory minimum.................................................................................... 7

   III.   Standards of Review.................................................................. 10

Summary of the Arguments................................................................. 11

Arguments and Citations of Authority................................................ 14

   I.   Over Mr. Smith's objection that his cocaine convictions were not "serious drug offenses" because Florida controlled all of cocaine's stereoisomers and the federal government did not, the government failed to prove that Mr. Smith's cocaine convictions involved a substance controlled under federal law at the time of his state crimes................................................................................ 14

A. The plain statutory language of the Florida and federal definitions of cocaine did not match at the time of Mr. Smith's prior offenses.................................................15

B. The government failed to meet its burden to show that the Florida and federal definitions covered the same substances....................................................................18

II. Mr. Smith's ACCA sentence plainly violates the Fifth and Sixth Amendments because the "different-occasions" requirement was not alleged in the indictment or proven to a jury a beyond a reasonable doubt. ......................................................................21

III. The district court reversibly erred in determining that Mr. Smith's Florida trafficking conviction was a "controlled substance offense" as defined in USSG § 4B1.2(b)(1).................29

A. This Court's binding precedent holds that Florida cocaine trafficking is not a "controlled substance offense.".................29

B. *Shannon* has not been overruled or undermined to the point of abrogation. ..................................................31

C. The district court's error warrants correction under any standard of review.................................................35

IV. Section 922(g)(1) violates the Second Amendment facially and as applied to Mr. Smith, a nonviolent convicted felon who was hunting alone with birdshot. .......................................38

A. *Bruen* overhauled the analysis used to determine whether a regulation is unconstitutional under the Second Amendment.................................................38

B. Applying *Bruen*, § 922(g)(1) violates the Second Amendment. .................................................40

1. The plain text of the Second Amendment covers Mr. Smith's conduct.................................................40

a. Mr. Smith is among "the people" protected by the Second Amendment. ...................................... 40

b. Mr. Smith's weapon and regulated conduct falls within the Second Amendment's plain text. ................. 41

2. The government cannot show an American tradition that individuals convicted of a felony  may never again possess firearms or ammunition. ...................................... 41

V. Section 922(g) violates the Commerce Clause, facially and as applied to Mr. Smith's purely intrastate possession of a shotgun that had been manufactured at an unspecified time, in an unspecified location "outside the State of Florida." .................... 46

Conclusion ................................................................................ 49

Certificate of Compliance with Type-Volume Limit .............................. 50

Certificate of Service .............................................................. 50

TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*Alderman v. United States,*
    562 U.S. 1163 (2011) ............................................................ 48

*Alleyne v. United States,*
    570 U.S. 99 (2013) ................................................................ 29

*Brown v. United States,*
    144 S. Ct. 1195 (2024) ......................................................... 16

*Burgess v. United States,*
    553 U.S. 124 (2008) ............................................................. 34

* *Chamu v. U.S. Att'y Gen.,*
    23 F.4th 1325 (11th Cir. 2022) ...................................... 19–20

* *Cintron v. U.S. Att'y. Gen.*
    882 F.3d 1380 (11th Cir. 2018) ...................................... 29, 31

*Conage v. United States,*
    346 So.3d 594 (Fla. 2022) .............................................. 6, 33

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ..................................................... 38, 40–41

* *Erlinger v. United States,*
    --- S. Ct. ----, 2024 WL 3074427 (June 21, 2024) .................. i, 22, 24–28

*Gamble v. United States,*
    587 U.S. 678 (2019) ............................................................. 48

*Henderson v. United States,*
    568 U.S. 266 (2013) ............................................................. 23

*Kanter v. Barr,*
    919 F.3d 437 (7th Cir. 2019) ......................................... 40, 42

**Cases**                                                      **Page(s)**

*Mathis v. United States,*
579 U.S. 500 (2016) ............................................................... 25

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ............................................................... 38

*Molina-Martinez v. United States,*
578 U.S. 189 (2016) ......................................................... 23, 37

\* *New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1, 19 (2022) ................................................ 39, 41–42

\* *Pereida v. Wilkinson,*
592 U.S. 224 (11th Cir. 2021) ....................................... 15, 20

*Range v. Att'y Gen.,*
69 F.4th 96 (3d Cir. 2023) .................................................. 43

*Rosales-Mireles v. United States,*
585 U.S. 129 (2018) ............................................................... 37

*Scarborough v. United* States,
431 U.S. 563 (1977) ............................................................... 47

*Shepard v. United States,*
544 U.S. 13 (2005) ................................................................. 25

*Shular v. United States,*
589 U.S. 154 (2020) ......................................................... 16, 32

*Sullivan v. Louisiana,*
508 U.S. 275 (1993) ............................................................... 23

\* *United States v. Bankston,*
945 F.3d 1316 (11th Cir. 2019) ............................... 11, 23, 36

*United States v. Bolatete,*
977 F.3d 1022 (11th Cir. 2020) .......................................... 38

**Cases**                                                                **Page(s)**

*United States v. Chubbuck,*
    252 F.3d 1300 (11th Cir. 2001) ...................................................... 33

\* *United States v. Conage,*
    976 F.3d 1244 (11th Cir. 2020) ............................................. 5, 7, 32, 34

*United States v. Conage,*
    50 F.4th 81 (11th Cir. 2022) ........................................................ 6, 31, 33

*United States v. Dominguez Benitez,*
    542 U.S. 74 (2004) .......................................................................... 24

*United States v. Duarte,*
    101 F.4th 657 (9th Cir. 2024) ...................................................... 41, 45

*United States v. Dubois,*
    94 F.4th 1284 (11th Cir. 2024) .................................................... 10, 38

*United States v. Duldulao,*
    87 F.4th 1239 (11th Cir. 2023) .................................................... 24, 27

\* *United States v. Dupree,*
    57 F.4th 1269 (2023) ................................................................... 34–36

*United States v. Hicks,*
    100 F.4th 1295 (11th Cir. 2024) .................................................. 31, 33

*United States v. Jimenez-Shilon,*
    34 F.4th 1042 (11th Cir. 2022) ......................................................... 41

*United States v. Jones,*
    743 F.3d 826 (2014) ......................................................................... 28

*United States v. Kuban,*
    94 F.3d 971 (5th Cir. 1996) .............................................................. 48

*United States v. Laines,*
    69 F.4th 1221 (11th Cir. 2023) ......................................................... 21

| Cases | Page(s) |
|---|---|

*United States v. Lee*,
586 F.3d 859 (11th Cir. 2009) ............................................................... 15

*United States v. Lopez*,
514 U.S. 549 (1995) .............................................................................. 46

*United States v. McCloud*,
818 F.3d 591 (11th Cir. 2016) ............................................................... 18

*United States v. Miles*,
75 F.4th 1213 (11th Cir. 2023) .............................................................. 10

*United States v. Morrison*,
529 U.S. 598 (2000) .............................................................................. 46

*United States v. Nash*,
438 F.3d 1302 (11th Cir. 2006) ................................................. 10, 22, 36

*United States v. Olano*,
507 U.S. 725 (1993) .............................................................................. 22

* *United States v. Rahimi*,
602 U.S. ----, 2024 WL 3074728 (June 21, 2024)..................... 42, 44–45

*United States v. Rodriguez-Gamboa*,
972 F.3d 1148 (9th Cir. 2020) ............................................................... 18

*United States v. Rozier*,
598 F.3d 768 (11th Cir. 2010) ............................................................... 38

*United States v. Scott*,
263 F.3d 1270 (11th Cir. 2001) ............................................................. 47

*United States v. Seekins*,
52 F.4th 988 (5th Cir. 2022)................................................................. 48

* *United States v. Shannon*,
631 F.3d 1187 (11th Cir. 2011) ...................................... 7, 29–31, 34, 36

**Cases**                                                                                       **Page(s)**

*United States v. Verdugo-Urquidez*,
   494 U.S. 259 (1990) ................................................................. 40

*United States v. Wright*,
   607 F.3d 708 (11th Cir. 2010) ....................................... 47–48

\* *Wooden v. United States*,
   595 U.S. 360 (2022) ......................................... 8–9, 20–21, 27

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 3 ................................................. 46

**Statutes**

18 U.S.C. § 924(a)(2) .............................................................. 22

18 U.S.C. § 924(e) .................................................................. 22

18 U.S.C. § 924(e)(1) ........................................................ 14, 21

18 U.S.C. § 924(e)(2)(A)(ii) ................................................. 15

21 U.S.C. § 802(14) (1993) .................................................. 17

21 U.S.C. § 802(14) (2001) .................................................. 17

21 U.S.C. § 812 (schedule II(a)(4)) (1993) ........................... 17

21 U.S.C. § 812 (schedule II(a)(4)) (2001) ........................... 17

Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 ............ 43

Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250,
   1251 (repealed) ................................................................. 43

Fla Stat. 893.135(1)(b)1. (2001) ........................................... 17

**Statutes**                                                          **Page(s)**

Fla. Stat. § 893.02(4) (1993) ........................................................ 16

Fla. Stat. § 893.03(2)(a)(4) (1993) ............................................ 17

Fla. Stat. § 893.03(2)(a)(4) (2001) ............................................ 17

Fla. Stat. § 893.13(a) (1993) ...................................................... 16

Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 ........................ 43

**Sentencing Guidelines**

\* USSG § 4B1.2(b)(1) .................................................... 30, 32, 34

**Other Authorities**

Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551 (2009).......... 43

Carlton F.W. Larson, F*our Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009).......................................................................... 42

Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187 (2015).......................................................................... 43

Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343 (2009)...................................... 43

## STATEMENT OF SUBJECT-MATTER
## AND APPELLATE JURISDICTION

This is a direct appeal from the final judgment in a criminal case of the United States District Court for the Middle District of Florida, Ocala Division, entered on January 20, 2022. Doc. 67. The district court had original jurisdiction pursuant to 18 U.S.C. § 3231.

Appellant/Defendant Reginald Smith, Jr. timely filed a notice of appeal on January 2, 2023 Doc. 69. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291, 1294 and 18 U.S.C. § 3742.

## STATEMENT OF THE ISSUES

I.    Whether the government failed to meet its burden to prove that Mr. Smith's Florida cocaine offenses were "serious drug offenses" under the Armed Career Criminal Act (ACCA) because, in response to Mr. Smith's objection that Florida's cocaine definition included all of cocaine's stereoisomers and the federal definition did not, the government failed to prove that the two definitions matched.

II.    Whether the district court plainly violated the Fifth and Sixth Amendments by enhancing Mr. Smith's statutory range under ACCA based on judicial fact-finding by a preponderance of the evidence that Mr. Smith had three prior offenses committed on "different occasions."

III.    Whether binding precedent establishes that Mr. Smith's Florida drug trafficking conviction is not a "controlled substance offense" under § 4B1.2(b)(1) of the United States Sentencing Guidelines.

IV.    Whether 18 U.S.C. § 922(g)(1) violates the Second Amendment, facially and as applied to Mr. Smith.

V.    Whether 18 U.S.C. § 922(g)(1) exceeds Congress's authority under the Commerce Clause, facially and as applied to Mr. Smith's intrastate possession.

STATEMENT OF THE CASE

## I.    Course of Proceedings

The government charged Mr. Smith by indictment with one count of possessing a firearm knowing he had been convicted of a crime punishable by more than a year's imprisonment, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e) (Count One), and one count of possessing MDMA, a Schedule I controlled substance, in violation of 21 U.S.C. § 844(a) (Count Two). Doc. 5. Mr. Smith pled guilty to both counts without a plea agreement. Doc. 38; Doc. 77.

Over Mr. Smith's objections, the district court determined that he was subject to the Armed Career Criminal Act (ACCA) enhancement and sentenced him to 180 months' imprisonment (180 months on Count One and 12 months on Count Two, to be served concurrently) followed by a three-year term of supervised release (three years on Count One and one year on Count Two, to be served concurrently). Doc. 67. Mr. Smith appealed. Doc. 69. He is incarcerated, serving his sentence in this case.

## II.    Statement of the Facts

### A.    Mr. Smith is charged for possessing a shotgun and nine pills while hunting.

In December 2019, Florida Fish and Wildlife Conservation Commission officers were investigating illegal hunting activity in a wooded area. Doc 64 (Final PSR) ¶ 6. The officers heard three gunshots. *Id.* While traveling towards the gunshots, they located Mr. Smith, standing in the woods holding a shotgun. At first, Mr. Smith ran on foot, but he quickly stopped, put down his shotgun, and laid down on the ground with his legs spread. *Id.*

Mr. Smith was arrested and searched. The search revealed a hunting knife, .22 caliber rifle rounds, and nine MDMA pills. *Id.* Mr. Smith explained that he was hunting for doves and quail and that he knew he was outside the permitted hunting boundary. *Id.* at ¶ 7. He also admitted to having shot two fox squirrels, which are a "species of special concern" and thus may not be hunted in Florida. *Id.*

Mr. Smith's shotgun was loaded with birdshot. *Id.* at 8. Upon research, an ATF agent discovered the shotgun was "manufactured and assembled inside the United States but outside of the State of Florida." *Id.* at ¶ 9. Mr. Smith was charged with, and pled guilty to, one count of

3

possessing a firearm—the shotgun—knowing he had been convicted of a crime punishable by more than a year's imprisonment, and one count of possession of MDMA. Doc. 5; Doc. 38.

### B.    Mr. Smith objects to the ACCA enhancement.

Mr. Smith's previous felony convictions included two Florida convictions for the sale of cocaine, allegedly committed on July 14 and 20, 1993, and one for trafficking cocaine, allegedly committed on July 15, 2001. Doc. 64 ¶ 33. His other prior offenses were less serious—including multiple driving-related offenses, resisting without violence, false imprisonment and misdemeanor battery (stemming from a single incident in 1999), and drug possession. *Id.* at ¶¶ 40–58; Doc. 82 at 11.

Initially, the United States Probation Office calculated Mr. Smith as having a total offense level of 12 and a Criminal History Category VI, resulting in a guidelines range of 30 to 37 months. Doc. 39 (Initial PSR) at ¶ 95. The government objected and argued that Mr. Smith was subject to the ACCA enhancement based on the three cocaine offenses described above. Doc. 47 (Revised PSR) at 29–30. Mr. Smith disagreed and argued that Florida trafficking in cocaine was not an ACCA predicate because it

4

could be committed by "purchase" and thus was broader than ACCA's "serious drug offense" definition. *See* Doc. 52 at 4–8.

The matter proceeded to sentencing, where multiple friends and family members spoke on Mr. Smith's behalf. Doc. 81 at 6–20. The district court then heard argument about whether Florida cocaine trafficking was a "serious drug offense." *See* Doc. 81 at 21–39, Doc. 54. At the time, this Court had issued a certified question to the Florida Supreme Court concerning what the state is required to prove to convict a defendant of purchasing a trafficking quantity of a controlled substance. *See United States v. Conage*, 976 F.3d 1244 (11th Cir. 2020) ("*Conage I*"). The district court thus continued Mr. Smith's sentencing pending this Court's resolution of *Conage*. *See* Doc. 54.

While the district court and the parties waited for *Conage*, Mr. Smith raised other objections to the ACCA enhancement. Relevant here, he objected that his prior cocaine convictions were not "serious drug offenses" because Florida's definition of cocaine was overbroad—it included all of cocaine and ecgonine's stereoisomers, but the federal definition did not. *See* Doc. 64 at 34 (citing *United States v. McCobb*, No. 20-12263, argued Jan. 25, 2022).

5

In the meantime, this Court received an answer to its certified question from the Florida Supreme Court in *Conage*. *See Conage v. United States*, 346 So.3d 594, 600 (Fla. 2022) ("*Conage II*"). *Conage II* explained that "purchase" under Florida law requires giving consideration for a trafficking quantity of drugs and a level of control over those drugs that is the same as constructive possession under federal law. Relying on that answer, this Court held that a Florida drug trafficking conviction could be a "serious drug offense" under ACCA even though it could be completed by purchase—which is not a type of conduct that appears in ACCA's "serious drug offense" definition—because it "involved" possession with intent to distribute. *United States v. Conage*, 50 F.4th 81, 81–82 (11th Cir. 2022) ("*Conage III*").

After *Conage III* issued, Probation revised Mr. Smith's PSR to reflect its new determination that he was subject to the ACCA enhancement because he had three "serious drug offense" convictions. Doc. 64 ¶ 33. Probation also revised Mr. Smith's base offense level—from 14 to 20—because it determined that his 2001 Florida cocaine trafficking

conviction was also "controlled substance offense." *Id.* ¶ 17.[1] As a result of applying ACCA, Probation also revised Mr. Smith's total offense level to 30 and his guidelines range to 180 to 210 months. Doc. 64 ¶¶ 34, 98.

### C. The district court sentences Mr. Smith to the mandatory minimum.

At the continued sentencing, Mr. Smith reviewed his objections—acknowledging that *Conage* had not come out in his favor but noting that he had also objected*, inter alia*, based on the pending *United States v. McCobb* case, which dealt with the statutory mismatch between the state and federal cocaine definition. Doc. 82 at 5–6; *see* Doc. 64 at 34. Although he admitted the proposed guideline calculations and ACCA designation were correct under existing Eleventh Circuit law, Mr. Smith maintained his objections. *Id.* at 6–7. The district court acknowledged that Mr. Smith was preserving the objections he had made earlier. *Id.* at 8, 22. It then adopted the facts and guideline calculations in the final presentence report and calculated Mr. Smith as having a total offense level of 30, a

---

[1] Probation did this despite binding precedent holding that Florida trafficking in cocaine by purchase was not a "controlled substance offense" under the Sentencing Guidelines. *See United States v. Shannon*, 631 F.3d 1187, 1189 (11th Cir. 2011). *Conage I* expressly distinguished *Shannon*. 976 F.3d at 1254 n.10.

7

criminal history category VI, and a guidelines range of 180 to 210 months' imprisonment. *Id.* at 9–10.

Mr. Smith's counsel presented an argument in mitigation. In particular, defense counsel noted that two of Mr. Smith's ACCA predicates were nearly 30 years old (for small sales of cocaine) and that his current offense involved hunting alone in the forest, "holding a shotgun filled with bird shot." *Id.* at 12. While Mr. Smith's prior felony convictions meant he shouldn't have had a firearm at all, hunting was "way of life" for his family and something that Mr. Smith's grandfather had taught him. *Id.* at 13. Defense counsel also noted that Mr. Smith had cooperated and accepted responsibility. *Id.*

Mr. Smith allocuted and apologized to the courts and to his family. *Id.* at 14. He explained that he had been hunting all his life and that, while he didn't expect to walk away with a slap on the back, a 15-year minimum sentence for hunting made him "question our system." *Id.*

The government then had an opportunity to speak. *Id.* at 15. It began by drawing the district court's attention to the Supreme Court's recent decision in *Wooden v. United States*, 595 U.S. 360 (2022). *Id.* at 16. *Wooden* held that deciding whether a defendant's predicate offenses were

committed on "different occasions," as required under ACCA, is a multi-factored inquiry that considers factors such as time, location, and the character and relationship of the offenses. 494 U.S. at 339–70. The government asserted that the dates of Mr. Smith's prior "serious drug offenses" were July 14, 1993, July 20, 1993, and July 15, 2001. Doc. 82 at 16. Those dates were part of the "unobjected-to-factual basis" of the final presentence report and thus, according to the government, established that Mr. Smith's offenses were committed on "different occasions" under *Wooden*. *Id.*

The government acknowledged Mr. Smith's ACCA predicates were old but added that since that time he had been convicted of drug possession and carrying a firearm. *Id.* at 16–17. Finally, it agreed that Mr. Smith had been "actually hunting" during the instant offense but reminded the district court that he had also been carrying a small quantity of drugs. *Id.* at 17–18.

The district court clarified that it was specifically adopting paragraph 33 of the presentence report—which listed the ACCA predicates as sale of cocaine committed on July 20, 1993, sale of cocaine committed on July 14, 1993, and trafficking in cocaine committed on July

15, 2001. *Id.* at 19. It then sentenced Mr. Smith to 180 months' imprisonment, consisting of 180 months as to Count One and 12 months as to Count Two, to run concurrently, followed by a three-year term of supervised release (three years as to Count One and one year as to Count Two, to run concurrently). *Id.* at 20. The Court stated that, but for ACCA's mandatory minimum, it would have imposed a lesser sentence. *Id.* at 22. Mr. Smith appealed. Doc. 69.

## III.   Standards of Review

**Issue I:** This Court reviews de novo whether a prior state conviction qualifies as a "serious drug offense" under the ACCA. *United States v. Miles*, 75 F.4th 1213, 1219 (11th Cir. 2023).

**Issues II, IV, V:** Constitutional issues are reviewed de novo, but this Court will reverse only for plain error when the issue is raised for the first time on appeal. *United States v. Nash*, 438 F.3d 1302, 1304 (11th Cir. 2006).

**Issue III:** The interpretation of the Sentencing Guidelines, including whether prior state conviction qualifies as a "controlled substance offense," is reviewed de novo. *United States v. Dubois*, 94 F.4th 1284, 1291 (11th Cir. 2024). This Court will reverse only for plain error,

10

however, when a defendant did not raise the issue in the district court. *United States v. Bankston*, 945 F.3d 1316, 1318 (11th Cir. 2019).

SUMMARY OF THE ARGUMENTS

I.    As the Supreme Court recently affirmed, a state crime is not an ACCA "serious drug offense" unless the state and federal definitions of the controlled substance matched at the time of the state offense. It is the government's burden to prove that the ACCA enhancement applies. Below, Mr. Smith objected that his Florida cocaine offenses were not "serious drug offenses" because Florida's cocaine definition, which included all stereoisomers, was broader than the federal definition. In response to his objection, however, the government failed to prove that the state and federal definitions matched. Because uncertainty in the record must be held against the government in the ACCA context, the government failed to meet its burden to establish that Mr. Smith is subject to ACCA. Accordingly, this Court should vacate his sentence and remand for resentencing without the ACCA enhancement.

II.    Mr. Smith's ACCA sentence violated the Fifth and Sixth Amendments because the government did not allege in the indictment, nor prove to a jury beyond a reasonable doubt, that his prior offenses

11

were committed on different occasions, as required under ACCA. The Supreme Court recently held that the Fifth and Sixth Amendments require that ACCA's fact-intensive "different occasions" requirement be proven to a jury beyond a reasonable doubt. Here, however, the district court relied on judicial fact-finding to find by a preponderance of the evidence that Mr. Smith's three offenses—including two small drug sales to an undercover agent allegedly committed a week apart in 1993—were committed on different occasions. Doing so resulted in an increased statutory range, in violation of Mr. Smith's constitutional rights. Thus, Mr. Smith's ACCA enhancement was plainly unconstitutional, affected his substantial rights, and should be vacated.

III.    The district court erred in enhancing Mr. Smith's base offense level based on an erroneous determination that Mr. Smith's 2001 Florida cocaine trafficking conviction was a "controlled substance offense" under the Sentencing Guidelines. This Court's binding precedent holds that Florida cocaine trafficking is not a "controlled substance offense" because it can be committed by purchasing, which is excluded from the plain, narrow definition of "controlled substance offense." Moreover, this Court's later decision (and the Florida Supreme Court opinion on which

12

it relied) holding that Florida cocaine trafficking is an ACCA "serious drug offense" did not overrule that binding precedent, but instead expressly distinguished the "controlled substance offense" definition. Accordingly, Mr. Smith's trafficking conviction is not a "controlled substance offense" and the enhancement should not have been applied.

IV.  Section 922(g)(1) violates the Second Amendment, facially and as applied to Mr. Smith. Mr. Smith is among "the people" whom the Second Amendment protects, despite his felony convictions, and his conduct of possessing a firearm is presumptively protected by the Second Amendment. The government cannot show a historical regulation distinctly similar to the total and permanent ban prohibiting all convicted felons from possessing a firearm for any reason—and it especially cannot show a history and tradition of disarming someone like Mr. Smith, who is nonviolent and whose prior felony convictions consist of mostly drugs and traffic-related offenses. Mr. Smith recognizes that that Court has held that felons are categorially disqualified from exercising any Second Amendment rights. He respectfully maintains for purposes of further review that § 922(g)(1) violates Second Amendment.

V.    Section 922(g)(1) is unconstitutional, facially and as applied, because it exceeds Congress's authority under the Commerce Clause by not requiring that the criminal activity (i.e., possession) substantially affect interstate commerce. To convict Mr. Smith, the government relied on the firearm having ostensibly travelled in interstate commerce at some point in time before he possessed it in Florida. The government established no connection between the charged conduct of possessing the firearm and interstate commerce. Mr. Smith recognizes that this Court has rejected Commerce Clause challenges to § 922(g)(1). He respectfully maintains, for purposes of further review, that the statute exceeds Congress's authority under the Commerce Clause.

### ARGUMENTS AND CITATIONS OF AUTHORITY

**I.    Over Mr. Smith's objection that his cocaine convictions were not "serious drug offenses" because Florida controlled all of cocaine's stereoisomers and the federal government did not, the government failed to prove that Mr. Smith's cocaine convictions involved a substance controlled under federal law at the time of his state crimes.**

Under ACCA, a defendant who violates 18 U.S.C. § 922(g)(1) and has three prior convictions for a "violent felony" or "serious drug offense" committed on different occasions faces an enhanced statutory range of 15 years to life. 18 U.S.C. § 924(e)(1). The district court sentenced Mr. Smith

14

under ACCA based on three Florida cocaine offenses. As explained below, the district court erred because the government failed to prove those state crimes were "serious drug offense[s]." *See Pereida v. Wilkinson*, 592 U.S. 224, 240 (11th Cir. 2021) (explaining that government bears burden of proof under ACCA); *United States v. Lee*, 586 F.3d 859, 866 (11th Cir. 2009) ("The prosecution bears the burden of proving that a sentencing enhancement under the ACCA is warranted.").

### A. The plain statutory language of the Florida and federal definitions of cocaine did not match at the time of Mr. Smith's prior offenses.

As relevant here, ACCA defines a "serious drug offense" as "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)), for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii). This issue involves only the definition's second component: "a controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802))." *Id.*

15

To determine whether Mr. Smith's cocaine offenses are "serious drug offense[s]," this Court applies the "categorical approach." S*hular v. United States*, 589 U.S. 154, 157–61 (2020). Under that approach, "[a] court must look only to the state offense's elements, not the facts of the case or labels pinned to the state conviction." *Id.* at 160. As relevant to the "controlled substance" component, this means that "[a] state drug offense counts as an ACCA predicate only if the State's definition of the drug in question 'matche[s]' the definition under federal law." *Brown v. United States*, 144 S. Ct. 1195, 1197 (2024) (quoting *Shular*, 589 U.S. at 158). Specifically, the state drug conviction must involve "a drug on the federal schedules at the time of [the state] offense." *Id.* at 1210.

In the district court, Mr. Smith objected that his Florida cocaine offenses were not "serious drug offense[s]" because Florida's definition of cocaine, which included all of its stereoisomers, and the federal definition of cocaine did not match. Doc. 64 at 34. At the time of Mr. Smith's 1993 sale of cocaine offenses, Florida prohibited selling a "controlled substance." *See* Fla. Stat. § 893.13(a) (1993). A controlled substance, in turn, was defined as "any substance named or described in Schedules I through V of s. 893.03." *Id.* § 893.02(4) (1993). And in 1993,

16

section 893.02(2)(a)4. controlled "[c]ocaine or ecgonine, *including any of their stereoisomers*, and any salt, compound, derivative, or preparation of cocaine or ecgonine." Fla. Stat. § 893.03(2)(a)(4) (1993) (emphasis added).

Similarly, at the time of Mr. Smith's 2001 cocaine trafficking conviction, that statute prohibited trafficking in cocaine "as described in s. 893.03(2)(a)4." Fla Stat. 893.135(1)(b)1. (2001). And as in 1993, in 2001 section 893.03(2)(a)4. controlled "[c]ocaine or ecgonine, *including any of their stereoisomers*, and any salt, compound, derivative, or preparation of cocaine or ecgonine." Fla. Stat. § 893.03(2)(a)(4) (2001) (emphasis added).

By contrast, in both 1993 and 2001, the federal government defined cocaine as "cocaine, its salts, *optical and geometric isomers*, and salts of isomers." 21 U.S.C. § 812 (schedule II(a)(4)) (1993); *id.* (2001); *see id.* § 802(14) (1993) ("[T]he term 'isomer' means any optical or geometric isomer."); *id.* (2001) ). Thus, on their face, Mr. Smith's Florida cocaine offenses did not necessarily involve a substance controlled by the federal government.

**B.    The government failed to meet its burden to show that the Florida and federal definitions covered the same substances.**

As noted above, the government bore the burden to establish Mr. Smith was subject to the ACCA enhancement. Yet in response to Mr. Smith's objection, the government put forward no evidence—or argument—that, despite the differing statutory language, Florida's definition of cocaine matched the federal definition. By remaining silent in the face of Mr. Smith's objection, the government failed to meet that burden. Thus, this Court should vacate Mr. Smith's sentence and remand for resentencing without the ACCA enhancement. *See United States v. McCloud*, 818 F.3d 591, 600 (11th Cir. 2016) (vacating ACCA sentence where government failed to meet its burden).[2]

Mr. Smith acknowledges that this Court's case law has questioned whether the statutory "isomer" differences between Florida's and the

---

[2] In other cases, the government has met its burden to support the ACCA enhancement by introducing expert testimony that, despite differing state and federal definitions of a particular controlled substance, the two definitions were, in reality, a categorial match. *See, e.g.*, *United States v. Rodriguez-Gamboa*, 972 F.3d 1148, 1151–52 (9th Cir. 2020) (presenting expert testimony that geometric isomers of methamphetamine are "impossible"). The government presented no such evidence here.

federal government's definitions of cocaine are illusory. *See Chamu v. U.S. Att'y Gen.*, 23 F.4th 1325, 1329–32 (11th Cir. 2022). Rather than cast doubt on his argument, however, those questions confirm that the government failed to meet in its burden to prove the ACCA enhancement.

In *Chamu*, an immigration petitioner similarly claimed that Florida's cocaine definition was overbroad because it included cocaine's stereoisomers while the federal definition included only optical and geometric isomers. 23 F.4th at 1329–31. *Chamu* reviewed the expert evidence and agreed that the term "stereoisomer" includes a non-optical, non-geometric isomer—a "nongeometric diastereomer." *Id.* at 1331. But, *Chamu* continued, "[i]f cocaine does not have a nongeometric diastereomer, then the two statutes cover exactly the same ground." *Id.* Ultimately, *Chamu* "c[ould ]not hold that Florida's definition of cocaine is completely consistent with the federal definition." *Id.* at 1332. The *Chamu* petitioner nevertheless lost because he failed to affirmatively prove that Florida's definition of cocaine covered more substances than the federal definition. *Id.*

There is a critical difference between Mr. Smith and the *Chamu* petitioner: Mr. Smith is a criminal defendant, not an immigration

19

petitioner. In the immigration context, the petitioner bears the burden of proof and "evidentiary gaps . . . work against the [petitioner] seeking relief." *Pereida*, 592 U.S. at 24. That "burden of proof" was "fatal for Chamu." *Chamu*, 23 F.4th at 1325. But in the ACCA context, the government bears the burden of proof. *See id.* (distinguishing out-of-circuit cases because burden of proof was on government in sentencing context); *supra* at 15.

So where the record is silent or a question remains in a case like Mr. Smith's, the "evidentiary gaps work against the government." *Pereida*, 592 U.S. at 240; *see id.* at 240 n.7 ("ACCA's categorical approach demands certainty from the government."); *Wooden v. United States*, 595 U.S. 360, 376 (2022) (Sotomayor, J., concurring) (explaining that "questions about the clarity of the record below . . . only underscore the Government's failure to carry its burden of proving the enhancement's application"). Any evidentiary gaps present here mean the government failed to meet its burden to prove Mr. Smith's cocaine convictions are "serious drug offense[s]." What was "fatal" for Chamu is equally "fatal"

for the government here.[3] This Court should vacate his sentence and remand for resentencing without the ACCA enhancement.

## II. Mr. Smith's ACCA sentence plainly violates the Fifth and Sixth Amendments because the "different-occasions" requirement was not alleged in the indictment or proven to a jury a beyond a reasonable doubt.

To trigger the ACCA enhancement, a defendant must have at least three predicate offenses that were "committed on different occasions from one another." 18 U.S.C. § 924(e)(1). Whether prior offenses were committed on "different occasions" requires a multifactored inquiry. *See Wooden*, 595 U.S. at 369–70. Relevant factors include proximity of time, proximity of location, and the character and relationship of the offenses. *Id.* And when there is a close call, ACCA's history and purpose—to "address the 'special danger' posed by . . . those who have repeatedly committed violent crimes"—may inform the finding. *Id.* at 370, 375.

As the Supreme Court recently held, under the Fifth and Sixth Amendments, this fact-intensive inquiry must be alleged in an

---

[3] *United States v. Laines*, 69 F.4th 1221, 1233–34 (11th Cir. 2023), is not to the contrary. *Laines* held that a defendant raising a similar statutory overbreadth argument for the first time on appeal bore the burden to establish plain error and could not do so. *Id.* at 1234. Unlike the *Laines* defendant, Mr. Smith objected below, putting the government to its burden.

21

indictment and proven to a jury beyond a reasonable doubt. *See Erlinger v. United States*, --- S. Ct. ----, 2024 WL 3074427, at *3–15 (June 21, 2024). Here, however, the district court engaged in judicial factfinding under a preponderance-of-the-evidence standard to determine that Mr. Smith committed his prior crimes on different occasions. Doing so violated his Fifth and Sixth Amendment rights. *See id.*[4]

Although Mr. Smith did not raise this "different occasions" issue in the district court, he can satisfy plain error. "To find reversible error under the plain error standard," this Court "must conclude that (1) an error occurred, (2) the error was plain, and (3) the error affected substantial rights." *Nash*, 438 F.3d at 1304 (internal quotation marks omitted). "If these three criteria are met," this Court can reverse if the error "'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (alteration adopted) (quoting *United States v. Olano*, 507 U.S. 725, 730–32 (1993)). Mr. Smith can satisfy all four conditions, so this Court "should exercise its discretion to correct the

---

[4] As a result of the unconstitutionally applied ACCA enhancement, Mr. Smith's mandatory minimum became 15 years in prison, exceeding the 10-year statutory maximum that would normally have applied to his § 922(g) offense. 18 U.S.C. §§ 924(a)(2), (e).

forfeited error." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016).

First, for the reasons explained above, the district court erred by relying on judicial factfinding to determine the fact-intensive question of whether Mr. Smith's prior offenses were committed on different occasions, which raised his statutory range from zero to 10 years to 15 years to life.

Second, under *Erlinger*, the error is plain. *See Bankston*, 945 F.3d at 1318 (explaining that error is plain if it violates binding precedent); *Henderson v. United States*, 568 U.S. 266, 279 (2013) (holding that courts should assess plainness at time of appellate review).

Third, Mr. Smith can show prejudice. For starters, *Erlinger* suggested the error is structural. During oral argument, Justice Gorsuch asked whether failing to subject the different-occasions question to the Constitution's indictment and jury-trial requirements constituted structural error. *See* Oral Arg. Tr. at 27–29, *Erlinger v. United States*, No. 23-370 (Mar. 27, 2024); *cf. Sullivan v. Louisiana*, 508 U.S. 275, 281–82 (1993) (holding that deprivation of right to jury verdict of guilt beyond reasonable doubt is structural error). The *Erlinger* majority opinion,

23

authored by Justice Gorsuch and joined by five other justices, did not expressly address whether the error was structural. *See generally Erlinger*, 2024 WL 3074427 at \*3–15; *see also id.* at \*15 (Roberts, J., concurring) (writing only for himself when stating that circuit court should consider on remand whether error was harmless). But it implied as much by explaining that the Court could not say whether a jury would have found the petitioner's prior offenses had been committed on different occasions. *Id.* at \*8 ("Presented with evidence about the times, locations, purpose, and character of those crimes, a jury might have concluded that some or all occurred on different occasions. Or it might not have done so. All we can say for certain is that the sentencing court erred in taking that decision from a jury of Mr. Erlinger's peers.").

Even if the error is not structural, Mr. Smith can show prejudice because there is a reasonable probability that, but for the error, the result of the district court proceeding would have been different. *See United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004). A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome" but is "less than a preponderance." *United States v. Duldulao*, 87 F.4th 1239, 1259 (11th Cir. 2023).

24

Had Mr. Smith been properly indicted and informed of his right to a jury trial and proof beyond a reasonable doubt on the multi-factored "different occasions" inquiry, there is a reasonable probability he would have put the government to its burden. And there is also a reasonable probability that the government would have been unable to prove to a jury that his two 30-year-old sale-of-cocaine convictions were for offenses committed on separate "occasions" under ACCA.

According to the PSR, the sales were committed one week apart in July 1993, involving small amounts of crack cocaine sold to an undercover law enforcement officer. Doc. 64 ¶¶ 33, 41, 46. But these "facts" do not resolve the issue. As an initial matter, this information came from *Shepard*[5] documents. Allowing a judge to use information in *Shepard* documents to decide whether a defendant committed his offenses on separate occasions "would be to allow a sentencing court to do exactly what the Fifth and Sixth Amendments forbid." *Erlinger*, 2024 WL 3074427, at *10.

Moreover, *Shepard* documents can be "prone to error." *Id.* at *11 (quoting *Mathis v. United States*, 579 U.S. 500, 512 (2016)). This is

---

[5] *Shepard v. United States*, 544 U.S. 13 (2005) (plurality opinion).

25

especially true for facts that are irrelevant to the prior proceeding, *id.*, such as the offense's date or location. "As a matter of fair notice alone, old recorded details, prone to error, sometimes untested, often inessential, and the consequences of which a defendant may not have appreciated at the time, should not come back to haunt him many years down the road by triggering a lengthy mandatory sentence." *Id.* (cleaned up).

Mr. Smith maintains that the government would be unable to prove to a jury beyond a reasonable doubt what was contained in the PSR and the *Shepard* documents on which it was based: that Mr. Smith committed two small sales of cocaine to an undercover officer seven days apart over thirty years ago. For example, many *Shepard* documents, like the charging information, would likely be inadmissible hearsay.

But even assuming that the government could prove those facts (or that this Court can consider those "facts" when conducting plain-error review because Mr. Smith did not dispute they could be proven by a preponderance of the evidence under the then-governing legal standard), there is still a reasonable probability a jury would conclude that the government failed to prove that two such sales, so close in time and character, were separate "occasions" for purposes of ACCA.

26

"After all, [the Supreme Court] has held that no particular lapse of time or distance between offenses automatically separates a single occasion from distinct ones. Often, a qualitative assessment about the character and relationship of the offenses may be required. So may an inquiry into whether the crimes shared a common scheme or purpose." *Erlinger*, 2024 WL 3074427, at *11 (citing *Wooden*, 595 U.S. at 369–70). For example, Mr. Smith's sales could have been a single "occasion" of selling a previously-agreed upon total amount of cocaine to the same undercover officer. Or Mr. Smith could have purchased cocaine one time and, over the course of a single "occasion," resold that same cocaine a few days apart to the same undercover officer.

*Erlinger* illustrates why the error here is "sufficient to undermine confidence in the outcome." *Duldulao*, 87 F.4th at 1259. Mr. Erlinger committed three burglaries nearly three decades earlier that, according to the *Shepard* documents, spanned several days and targeted different businesses. *Erlinger*, 2024 WL 3074427, at *4. Nevertheless, *Erlinger* explained, "Presented with [reliable] evidence about the times, locations, purpose, and character of those crimes, a jury might have concluded that some or all occurred on different occasions. Or it might not have done so.

27

All we can say for certain is that the sentencing court erred in taking that decision from a jury of Mr. Erlinger's peers." *Id.* at *8.

Mr. Smith's case presents an even closer call than Mr. Erlinger's. Unlike in *Erlinger*, there is nothing to suggest that the crimes occurred at different locations. If a jury could have found Mr. Erlinger's burglaries spanning multiple days and businesses comprised a single "occasion," it certainly could have found that Mr. Smith's two small cocaine sales—which the PSR states occurred seven days apart with an undercover officer—were one "occasion." *See supra* at 26–27. At a minimum, the possibility of such a result undermines confidence in the outcome and thus satisfies the third prong of plain error.

Fourth, the error "seriously affects the fairness, integrity, or public reputation of the judicial proceedings" because Mr. Smith received "a mandatory minimum that exceeds the statutory maximum" without the improperly applied ACCA enhancement. *United States v. Jones*, 743 F.3d 826, 830 (11th Cir. 2014); *see Erlinger*, 2024 WL 3074427, at *8 (explaining that district court's fact-finding increased both maximum and minimum sentences)*; supra* n.4. Accordingly, this Court should vacate Mr. Smith's sentence and remand for resentencing without the

28

ACCA enhancement. *Accord Alleyne v. United States*, 570 U.S. 99, 117–18 (2013) (remanding for resentencing consistent with jury verdict where judge, rather than jury, found "brandishing" element).

## III. The district court reversibly erred in determining that Mr. Smith's Florida trafficking conviction was a "controlled substance offense" as defined in USSG § 4B1.2(b)(1).[6]

### A. This Court's binding precedent holds that Florida cocaine trafficking is not a "controlled substance offense."

The district court enhanced Mr. Smith's base offense level from 14 to 20 because it determined that his Florida cocaine trafficking conviction was a "controlled substance offense" under the Sentencing Guidelines. Doc. 64 ¶ 17. That determination was erroneous because, under this Court's binding precedent, Florida cocaine trafficking convictions are not "controlled substance offense[s]." *See United States v. Shannon*, 631 F.3d 1187 (11th Cir. 2011) (holding that Florida trafficking by "purchase" is not "controlled substance offense"); *Cintron v. U.S. Att'y. Gen.* 882 F.3d 1380, 1385 (11th Cir. 2018) (holding that alternative methods of

---

[6] If this Court disagrees that the district court erroneously imposed the ACCA enhancement, then this error would be harmless because Mr. Smith received the mandatory minimum sentence under ACCA.

29

committing trafficking under Florida law are means, not elements, so statute is indivisible).

The Sentencing Guidelines define "controlled substance offense" as follows:

> The term "controlled substance offense" means an offense under . . . state law, punishable by imprisonment for at term exceeding one year, that . . . prohibits the manufacture, import, export, distribution or dispending of a controlled substance . . . or the possession of a controlled substance . . . with intent to manufacture, import, export, distribute, or dispense.

USSG § 4B1.2(b)(1). "Significantly, this definition does not include the act of purchase." *Shannon*, 631 F.3d at 1188. By contrast, the drug trafficking statute under which Mr. Smith was convicted states: "Any person who knowingly sells, *purchases*, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of, 28 grams or more of cocaine . . ., commits a felony of the first degree, which felony shall be known as 'trafficking in cocaine[.]' " Fla. Stat. § 893.135(1)(b)1. (2001) (emphasis added).

*Shannon* compared § 4B1.2(b)(1)'s "controlled substance offense" definition to section 893.135(1)(b)1. and held that because the act of "purchase" is not included in § 4B1.2(b)(1), Florida drug trafficking by

30

purchase is not a "controlled substance offense." 631 F.3d at 1189. And in *Cintron*, this Court examined section 893.135 and held that "the statutory language 'sells, purchases, manufactures, delivers, or brings into this state, or who is knowingly in actual or constructive possession of,'" listed . . . alternative means of committing a single crime." 882 F.3d at 1385. Thus, binding precedent establishes that Mr. Smith's trafficking conviction is not a "controlled substance offense." Under the prior panel precedent rule, this Court is bound by *Shannon* and *Cintron*. *See United States v. Hicks*, 100 F.4th 1295, 1299–1300 (11th Cir. 2024) (explaining this Court's strong prior panel precedent rule).

## B.  *Shannon* has not been overruled or undermined to the point of abrogation.

Although in *United States v. Conage*, 50 F.4th 81 (11th Cir. 2022) ("*Conage III*"), this Court held that the inclusion of "purchase" does not render the Florida drug trafficking statute overbroad as compared to ACCA's "serious drug offense" definition, *Conage III* does not change the outcome here. ACCA's "serious drug offense" definition and the Sentencing Guideline's "controlled substance offense" definition materially differ. The "serious drug offense" definition broadly encompasses state crimes that "involve"—i.e., "necessarily entail" or

31

"require"—any of the enumerated conduct, including possession with intent to distribute. *See Shular*, 589 U.S. at 158, 160, 162; *United States v. Conage*, 976 F.3d 1244, 1252 (11th Cir. 2020) ("*Conage I*"). By contrast, the "controlled substance offense" definition is narrower. A "controlled substance offense" "means" a state crime that "prohibits" the listed conduct. USSG § 4B1.2(b)(1).

When certifying the question about the meaning of "purchase" to the Florida Supreme Court, *Conage I* recognized those differences, expressly distinguishing *Shannon* and the "controlled substance offense" definition. 976 F.3d at 1254 n.10. *Conage I* explained that the guidelines define a control substances offense as a felony offense that "<u>prohibits</u>" specified acts "and does not include 'purchase' as one of the prohibited acts." *Id.* ACCA, by contrast, "does not require that the predicate drug conviction be based on a state that expressly prohibits one of the specified acts set out in the ACCA." *Id.* Instead, "ACCA's definition <u>broadly includes</u> any offense '<u>involving</u>'" certain conduct. *Id.* (internal quotation marks omitted). "Thus," *Conage I* continued, "the ACCA's definition of serious drug offense is broader than the guidelines definition of a controlled substance offense." *Id.* In short, even if one panel could

32

overrule another—which it cannot, s*ee Hicks*, 100 F.4th at 1299–1300—the *Conage* panel did not overrule *Shannon* but instead expressly distinguished it.

It is true that intervening on-point case law from the Florida Supreme Court can abrogate prior panel precedent. *See United States v. Chubbuck*, 252 F.3d 1300, 1305 n.7 (11th Cir. 2001). But no such intervening precedent exists here. The Florida Supreme Court, in answering this Court's certified question, stated that for a completed "purchase" under the state's drug trafficking statute, the defendant must (1) give consideration for and (2) obtain control over a specified quantity of drugs. *Conage v. United States*, 346 So.3d 594, 600 (Fla. 2022) ("*Conage II*"). The Florida Supreme Court also opined that the "control" required was synonymous with constructive possession under federal law. *Id.*

This Court in *Conage III* then relied on that holding—and the Court's reasoning in *Conage I*—to conclude that "purchase" satisfies the "serious drug offense" definition because it "involves" constructive possession under federal law. 50 F.4th at 81–82. But the fact that "purchase" under the Florida drug trafficking statute "involves" constructive possession does not undermine *Shannon* to the point of

33

abrogation. Indeed, as *Conage I* explained, *Shannon*'s holding that Florida trafficking is not a "controlled substance offense" turns not on the meaning of "purchase" under state law but on "the plain language of § 4B1.2(b)." *Conage I*, 976 F.3d at 1254 n.10 (quoting *Shannon*, 631 F.3d at 1189).

This Court's en banc decision in *United States v. Dupree*, 57 F.4th 1269 (2023), supports *Shannon*'s holding that the plain language of § 4B1.2(b)(1) does not accommodate trafficking by "purchase"— regardless of whether "purchase" requires in part constructive possession. *Dupree* considered whether § 4B1.2(b)(1)'s definition included inchoate crimes like conspiracy offenses. As *Dupree* explained, § 4B1.2(b)(1) provides that "[t]he term controlled substance offense *means* an offense . . . that prohibits" certain conduct. *Id.* at 1277 (quoting USSG § 4B1.2(b)(1)) (emphasis added). "A 'definition which declares what a term 'means' excludes any meaning that is not stated.'" *Id.* (quoting *Burgess v. United States*, 553 U.S. 124, 130 (2008)). Thus, *Dupree* concluded, the exclusion of inchoate crimes from the definition was a "strong indicator that the term did not include those offenses." *Id.*

34

The same result follows here. The exclusion of "purchase" from the guideline's text indicates that the definition does not include crimes that prohibit purchase. To hold otherwise would be to improperly add an offense not listed in the Guideline's text. *See id.* That a completed purchase requires in part control akin to constructive possession does not change that "purchase" is specific conduct that has been excluded from the "controlled substance offense" definition.

Additionally, § 4B1.2(b)(1)'s use of the word "prohibit" requires that the state offense must "forbid by law" the specified conduct. *Id.* at 1279. Florida's drug trafficking statute, however, "forbid[s] by law" a different type of conduct not specified in the definition—purchase. And since the guideline's use of "means" requires the exclusion of anything outside the listed conduct in the definition, it follows that Florida's drug trafficking statute is not a "controlled substance offense."

## C.    The district court's error warrants correction under any standard of review.

Mr. Smith objected below that his Florida trafficking offense should not be used to enhance his sentence under ACCA. Although he did not specifically argue that the crime was not a "controlled substance offense" under the Sentencing Guidelines, he had no reason to dispute the

"controlled substance offense" enhancement because it was harmless in light of the district court's ACCA determination. *See* n.6, *supra*. He thus maintains this Court should review for preserved error.

In any event, even if this Court reviews for plain error, reversal is warranted. *See Nash*, 438 F.3d at 1304. First, for the reasons explained above, the district court erred in enhancing Mr. Smith's base offense level based on its determination that his Florida drug trafficking conviction was a "controlled substance offense.

Second, the error is plain because it "flies in the face of . . . binding precedent." *Bankston*, 945 F.3d at 1318; *see Shannon*, 631 F.3d at 1189. It also violates the plain language of § 4B1.2(b)(1), as interpreted in *Dupree*, 57 F.4th at 1277–79, because the Guideline's text excludes any offense that does not "forbid" the specified conduct listed in the definition—which does not include purchase. *See supra* at 34–35; *Bankston*, 945 F.3d at 1318–1319 (holding that district court plainly erred by applying guideline enhancement that was contrary to plain meaning of guideline text and commentary).

Third, assuming Mr. Smith is not subject to the ACCA enhancement, he can show that the error affected his substantial rights

because the error increased his base offense level from 14 to 20. *Compare* Doc. 47 ¶ 17, *with* Doc. 64 ¶ 20. Without the error (and without the erroneously applied ACCA enhancement, *see supra* Parts I and II), his guidelines range would drop from 51–63 months to 30–37 months. As the Supreme Court has explained, "[w]hen a defendant is sentenced under an incorrect Guidelines range—whether or not the defendant's ultimate sentence falls within the correct range—the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez*, 578 U.S. at 198.

Fourth, "[t]he risk of unnecessary deprivation of liberty," which attends inaccurate Guidelines calculations, "particularly undermines the fairness, integrity, or public reputation of judicial proceedings in the context of a plain Guidelines error." *Rosales-Mireles v. United States*, 585 U.S. 129, 140 (2018). Additionally, "Guidelines miscalculations ultimately result from judicial error," and a "resentencing is a brief event" that "does not invoke the same difficulties as a remand for retrial does." *Id.* Thus, this Court should exercise its discretion to correct the error, vacate Mr. Smith's sentence, and remand for resentencing.

**IV.  Section 922(g)(1) violates the Second Amendment facially and as applied to Mr. Smith, a nonviolent convicted felon who was hunting alone with birdshot.**

The statute criminalizing possession of a firearm by a felon violates the Second Amendment facially and as applied to Mr. Smith, whose conduct and prior felony convictions are nonviolent. Mr. Smith recognizes this Court's precedent holding that, under *District of Columbia v. Heller*, 554 U.S. 570 (2008), "felons are categorically 'disqualified' from exercising their Second Amendment right." *United States v. Dubois*, 94 F.4th 1284, 1293 (11th Cir. 2024) (quoting *United States v. Rozier*, 598 F.3d 768, 770–71 (11th Cir. 2010)). But for purposes of further review, he respectfully maintains that 18 U.S.C. § 922(g)(1) is unconstitutional under the Second Amendment.

**A.  *Bruen* overhauled the analysis used to determine whether a regulation is unconstitutional under the Second Amendment.**

After *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010), this Court (and many others) applied a two-step approach in Second Amendment cases. *See United States v. Bolatete*, 977 F.3d 1022, 1036 (11th Cir. 2020) ("We use a two-step inquiry when deciding a Second Amendment issue. First, we ask if the restricted activity is within the scope of protection of the Second Amendment in the first place. If it is, we

38

apply an appropriate form of means-end scrutiny." (citation omitted)). But in *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court rejected the two-step approach as being "one step too many." 597 U.S. 1, 19 (2022). Instead, the Supreme Court adopted a test divorced from means-end scrutiny. *See id.* at 23.

Under *Bruen*, if "the Second Amendment's plain text covers an individual's conduct, then the Constitution presumptively protects that conduct." *Id.* at 17. And if the individual's conduct is presumptively protected, then a firearm regulation "falls outside the Second Amendment's unqualified command" "[o]nly if [the] firearm regulation is consistent with this Nation's historical tradition." *Id.* (citation omitted). The government bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

39

**B.    Applying *Bruen*, § 922(g)(1) violates the Second Amendment.**

> **1.    The plain text of the Second Amendment covers Mr. Smith's conduct.**

>> **a.    Mr. Smith is among "the people" protected by the Second Amendment.**

"[T]he people" protected by the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580; *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (concluding that "the people" in the First, Second, Fourth, Ninth, and Tenth Amendments "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"). Mr. Smith is a United States citizen and lifelong resident. Doc. 64 at 2; *id.* ¶ 77. Thus, he is among "the people" who enjoy protection under the Second Amendment.

That Mr. Smith has also previously been convicted of felony offenses does not change this conclusion. Felons are not "categorically excluded from our national community" and fall within the amendment's scope. *Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting); *see United States v. Duarte*, 101 F.4th 657, 671–76 (9th Cir.

2024) (explaining, post-*Bruen*, why a citizen who has been convicted of felonies is part of "the people" for purposes of the Second Amendment); *see also United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (noting that felons are "indisputably part of 'the people'").

> **b.     Mr. Smith's weapon and regulated conduct falls within the Second Amendment's plain text.**

Mr. Smith's regulated conduct was possessing a shotgun. The Supreme Court has held that possession of firearms outside the home is protected by the Second Amendment. *Bruen*, 597 U.S. at 32; *cf. Heller*, 554 U.S. at 559 ("The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting."). Because his regulated conduct falls within the Second Amendment's plain text, it is presumptively lawful. *See Bruen*, 597 U.S. at 17.

> **2.     The government cannot show an American tradition that individuals convicted of a felony may never again possess firearms or ammunition.**

Section 922(g)(1), a 20th century innovation, is a total and permanent ban prohibiting all individuals convicted of any felony from possessing any firearm for any reason. Possession of a firearm by one who

41

was convicted of a felony is not a "dramatic technological change" that was "unimaginable at the founding." *Id.* at 28–29. Because this is a "general societal problem that has persisted since the 18th century," the government must show a "distinctly similar historical regulation" that addressed the issue, *id.* at 26, rather than a "relevantly similar" historical analogue, *id.* at 29.

The government cannot meet this burden. Neither the government nor any state government historically stripped all persons convicted of any felony from ever possessing a firearm.[7] *See, e.g.*, *Kanter*, 919 F.3d at 458 (Barrett, J., dissenting); Carlton F.W. Larson, F*our Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1374, 1376 (2009). It was not until the 20th century that legislatures began to pass modern, categorical firearms bans, including the first to include felons. Congress passed the first version of the modern federal firearm ban for violent felons in 1938,

---

[7] In *United States v. Rahimi*, 602 U.S. ----, 2024 WL 3074728, \*10–11 (June 21, 2024), the Supreme Court upheld the constitutionality of 18 U.S.C. § 922(g)(8), which "temporarily" disarms individuals under a restraining order with a finding that the individual presents a "credible threat to the physical safety" of a partner or child. Section 922(g)(1), by contrast, is permanent and contains no requirement that the disarmed individual pose a safety threat.

expanding it to include non-violent felons in 1961 and all possession in 1968. *See* Federal Firearms Act of 1938, 75 Cong. Ch. 850, § 2(e), 52 Stat. 1250, 1251 (repealed); Act of Oct. 3, 1961, Pub. L. No. 87–342, 75 Stat. 757 (repealed); Gun Control Act of 1968, Pub. L. 90–618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921–928).

State laws disarming felons were, likewise, first adopted in the early-20th century. *See* Adam Winkler, Heller*'s Catch-22*, 56 UCLA L. Rev. 1551, 1563 (2009) ("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Nelson Lund, *The Second Amendment,* Heller*, and Originalist Jurisprudence*, 56 UCLA L. Rev. 1343, 1357 (2009) (similar); Lawrence Rosenthal, *The Limits of Second Amendment Originalism and the Constitutional Case for Gun Control*, 92 Wash. U. L. Rev. 1187, 1211 (2015) (similar). The government cannot show an American tradition of firearms regulation preventing one who has ever been convicted of a felony from ever possessing a firearm. *See Range v. Att'y Gen.*, 69 F.4th 96, 106 (3d Cir. 2023) (en banc), petition for cert. filed, No. 23-374 (U.S. Oct. 5, 2023).

The government's failure to meet its burden is even clearer as applied to Mr. Smith. Mr. Smith is nonviolent. His instant offense involved him alone, in the woods, hunting small game with birdshot. He was engaged in nothing like the kind of menacing conduct prohibited at common law by the "going armed" laws. *See United States v. Rahimi*, 602 U.S. ----, 2024 WL 3074728, *8–9 (June 21, 2024).

Nor do his prior felony convictions establish that disarmament was necessary to prevent violence. *Cf. id.* at *7–8 (discussing surety laws, which, after affording "significant procedural protections," could temporarily disarm individual if reasonable fear he would commit violence); *id.* at *11 (holding that individual found by court to pose credible safety threat may be temporarily disarmed). Those convictions consist primarily of traffic and related offenses, along with drugs (including the possession of more than 28 grams of cocaine 20 years earlier and two small sales when he was 18, nearly 30 years earlier), fleeing, and resisting law enforcement without violence. Doc. 64 ¶¶ 40–54. The government cannot show that Mr. Smith's "predicate offenses were, by Founding era standards, of a nature serious enough to justify permanently depriving him of his fundamental Second Amendment

44

rights." *Duarte*, 101 F.4th at 691 (discussing prior convictions for drug possession and evading a police officer); *id.* at 691 n.16 (noting that criminalization of drug possession is a product of the 20th century and that "what we now think of as 'illicit drugs,' such as . . . cocaine" were legal "for a long stretch of this country's history").[8]

In sum, there is no historical tradition of gun regulations "distinctly similar" to § 922(g)(1)—and the government cannot meet its burden of showing that there is. Accordingly, § 922(g)(1) is unconstitutional, facially and as applied to Mr. Smith. Mr. Smith's conviction must be vacated.

---

[8] Mr. Smith also has a conviction for misdemeanor battery and false imprisonment stemming from a single incident in 1999. Doc. 64 ¶ 49. According to the PSR, a verbal alteration escalated but involved no weapons and apparently did not result in any injuries. *Id.* Even if that incident could be construed as violent, the government cannot show a history and tradition of permanently depriving individuals of their Second Amendment rights based on an a single, quarter-century-old false imprisonment and misdemeanor battery, either. *Cf. Rahimi,* 2024 WL 3074728, at *8 (explaining that surety laws imposed *temporary* disarmament of no more than six months at a time, with exceptions for when individual needed his arms for legitimate reason); *Duarte*, 101 F.4th at 689 (explaining that many of today's felonies would have been misdemeanors or nonexistent at common law).

45

**V.    Section 922(g) violates the Commerce Clause, facially and as applied to Mr. Smith's purely intrastate possession of a shotgun that had been manufactured at an unspecified time, in an unspecified location "outside the State of Florida."**

Mr. Smith respectfully maintains, for the purposes of further review, that his conviction should be vacated because 18 U.S.C. § 922(g) exceeds Congress's authority under the Commerce Clause. *See* U.S. Const. art. I, § 8, cl. 3.

Section 922(g) prohibits possession, a non-economic activity, and does not ensure that this activity "substantially affects" interstate commerce, as required by the Supreme Court. *See United States v. Lopez*, 514 U.S. 549, 561–68 (1995). Indeed, the "jurisdictional hook" set forth in § 922(g)—"in or affecting commerce"—suffers from two infirmities: (1) it is not limited to "interstate or foreign commerce," and (2) it does not ensure on a case-by-case basis that the activity being regulated (possession) "substantially affects" interstate or foreign commerce. *Id.*; *United States v. Morrison*, 529 U.S. 598 (2000). Section § 922(g) is therefore facially unconstitutional.

Section 922(g) is also unconstitutional as applied to Mr. Smith's purely intrastate conduct of possessing the shotgun while hunting. The

46

ATF agent who analyzed the firearm determined that it had been manufactured "in the United States but outside the State of Florida" and thus inferred that it must have traveled in interstate commerce to reach Mr. Smith in Florida. Doc. 64 at ¶ 9. There was no indication of when the firearm was manufactured or traveled to Florida or how many hands it passed through within Florida before reaching Mr. Smith.[9]

Mr. Smith recognizes that his argument is currently foreclosed. Relying upon *Scarborough v. United States*, 431 U.S. 563 (1977), this Court has said that § 922(g)'s "in or affecting commerce" language indicates Congress's intent "'to assert its full Commerce Clause power.'" *United States v. Wright*, 607 F.3d 708, 715 (11th Cir. 2010). This Court has also rejected that § 922(g) is unconstitutional in light of *Lopez* and *Morrison*. *See, e.g.*, *United States v. Scott*, 263 F.3d 1270, 1271–74 (11th Cir. 2001). Finally, this Court has held that the minimal nexus requirement is met when the government establishes a firearm is manufactured outside the state in which the offense took place. *See*

---

[9] It is also unclear why the agent was unable to provide a state of manufacture but was confident that it was not Florida.

47

*Wright*, 607 F.3d at 715–16. Mr. Smith still preserves this argument for purposes of any further review.[10]

---

[10] *See, e.g.*, *Gamble v. United States*, 587 U.S. 678, 710 n.1 (2019) (Thomas, J., concurring) ("By legislating beyond its limited powers, Congress has taken from the People authority that they never gave . . . . Indeed, it seems possible that much of Title 18, among other parts of the U.S. Code, is premised on the Court's incorrect interpretation of the Commerce Clause and is thus an incursion into the States' general criminal jurisdiction and an imposition on the People's liberty."); *Alderman v. United States*, 562 U.S. 1163, 1168 (2011) (Thomas, J., dissenting from the denial of a petition for writ of certiorari) ("Fifteen years ago in *Lopez*, we took a significant step toward reaffirming this Court's commitment to proper constitutional limits on Congress' commerce power. If the *Lopez* framework is to have any ongoing vitality, it is up to this Court to prevent it from being undermined by a 1977 precedent that does not squarely address the constitutional issue."). *United States v. Seekins*, 52 F.4th 988, 989 (5th Cir. 2022) (Ho, Smith, Engelhardt, JJ, dissenting from denial of rehearing en banc) ("For too long, our circuit precedent has allowed the federal government to assume all but plenary power over our nation. In particular, our circuit precedent licenses the federal government to regulate the mere possession of virtually every physical item in our nation—even if it's undisputed that the possession of the item will have zero impact on any other state in the union. The federal government just has to demonstrate that the item once traveled across state lines at some point in its lifetime, no matter how distant or remote in time. That is no limit at all." (citation omitted)); *United States v. Kuban*, 94 F.3d 971, 977 (5th Cir. 1996) (Demoss, J., dissenting) (noting the conflict between *Scarborough* and *Lopez*).

48

**CONCLUSION**

For the reasons explained above, the Court should vacate Mr. Smith's § 922(g)(1) conviction and sentence and remand for resentencing on his § 844 conviction. Alternatively, this Court should vacate Mr. Smith's sentence and remand for resentencing.

Respectfully submitted,

A. Fitzgerald Hall, Esq.
Federal Defender, MDFL

*/s/ Katherine Howard*
Katherine Howard, Esq.
Assistant Federal Defender
NY Atty Reg. No. 5624275
201 South Orange Avenue, Suite 300
Orlando, Florida 32801
Telephone 407-648-6338
E-mail: Katherine_Howard@fd.org

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

In accordance with Fed. R. App. P. 32(g)(1), I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 9,742 words according to Microsoft Word's word count, excluding the parts exempted by Fed. R. App. P. 32(f).

/s/Katherine Howard
Katherine Howard, Esq.
Counsel for Mr. Smith

**CERTIFICATE OF SERVICE**

I certify that on June 24, 2024, a true copy of the foregoing *Initial Brief of Appellant* was filed using the Court's Electronic Case Filing system, which will send notification to Holly L. Gershow, Assistant United States Attorney.

/s/Katherine Howard
Katherine Howard, Esq.
Counsel for Mr. Smith

50